RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE 9-30-05
BY DM

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

WILL-DRILL RESOURCES, INC., C.
ALLEN WILLIAMS, LW/EW FAMILY
PARTNERS, LTD. #2, LW/EW FAMILY
LTD. #3, VISTA VENTURES, L.L.C.,
SEVILLE OIL & GAS, L.L.C., SABLE
ENERGY, L.L.C., SABLE PARTNERS
L.L.C., DUNDEE INVESTMENTS, L.L.C.,
and ENVISION ENTERPRISES, L.L.C.

versus

SAMSON RESOURCES CO.

CIVIL ACTION NO. 02-0406
JUDGE TOM STAGG

## MEMORANDUM RULING*

Before the court is a motion to re-urge a previously filed motion for summary judgment filed by the plaintiffs Will-Drill Resources, Inc. ("Will-Drill"),[1] and a

---

*This opinion is not intended for commercial print or electronic publication.

[1] The entire list of the plaintiffs include Will-Drill and various ventures, partnerships, individuals, companies and limited liability companies. The court, for sake of convenience, will collectively refer to these numerous parties as "Will-Drill."

1

motion for partial summary judgment filed by the defendant, Samson Resources Company ("Samson"). See Record Documents 85 and 89. For the reasons set forth below, Will-Drill's motion for summary judgment is **DENIED**, and Samson's motion for partial summary judgment (Record Document 89) is **GRANTED** to the extent that it seeks dismissal of the plaintiffs' claims against it.

## I. BACKGROUND

A.  Facts.[2]

Will-Drill, acting for itself and as agent for over forty others, offered for sale mineral leases and related assets in Mississippi. Samson, an oil and gas company interested in purchasing the properties, entered into a Confidentiality Agreement with Will-Drill which permitted Samson to review proprietary information about the properties and set out the process that would lead to a possible transaction. The Confidentiality Agreement, signed by C. Allen Williams, Vice-President of Will-Drill, and by Scott Rowland, Samson's Manager of Acquisitions and Divestitures and also its "Attorney-In-Fact", provided:

> 8.  *Definitive Agreement.* [Samson] understands and

---

[2]The facts and procedural history of this matter are borrowed heavily from the well-written summary provided in the opinion of the Fifth Circuit Court of Appeals. See Will-Drill Resources, Inc. v. Samson Resources Co., 352 F.3d 211 (5th Cir. 2003).

2

agrees that no contract or agreement providing for a business transaction between Will-Drill and [Samson] or [Samson's] affiliates shall be deemed to exist unless and until a Definitive Agreement has been executed and delivered to [Samson] and each of the other parties thereto, and [Samson] hereby waives, in advance, any claims, including, without limitation, breach of contract, if any, in connection with such a transaction unless and until a Definitive Agreement has been executed and delivered by [Samson] and each of the other parties thereto. It is also agreed that unless and until a Definitive Agreement between Will-Drill and [Samson] with respect to a Transaction has been executed and delivered, neither [Samson] nor Will-Drill has any legal obligation of any kind whatsoever with respect to any such Transaction outside of the obligations in this Agreement. For purposes of this paragraph, the term "Definitive Agreement" does not include an executed letter of intent or any other preliminary written agreement, nor does it include any written or oral acceptance of any offer or bid made by [Samson]. Neither this paragraph nor any other provision in this Agreement can be waived or amended except by written consent of Will-Drill, which consent shall specifically refer to this paragraph (or such other provision) and explicitly make such waiver or amendment.

Record Document 89, Ex. 4. In the Confidentiality Agreement, "Will-Drill" was specifically defined as "Will-Drill Resources, Inc., and its affiliates, partners, venturers and others having any interest in the Properties." "Transaction" was defined as "a negotiated purchase by [Samson] of the Properties owned by Will-Drill or any portion thereof." "Definitive Agreement" was defined as "the final definitive

business agreement containing the terms and conditions of the Transaction which has been fully executed by all parties thereto."

Will-Drill contends that the intent was to sell the properties as a package to a single buyer, but Samson expressed a desire to purchase only the property located in Hub Field. Samson submitted a written offer to purchase only the interests in Hub Field. Additional discussion and negotiation followed. Samson submitted another written offer to purchase the Hub Field properties and the Improve Field properties. The offer price for the Improve Field was not acceptable to the sellers so the parties continued to work on the sale of Hub Field only.

After reviewing the information and negotiating with representative owner and general counsel for Will-Drill, Earnest Nix, Jr. ("Nix"), Samson presented Nix with a Proposed Sale Agreement ("PSA").[3] The PSA, in its opening paragraphs, stated that Samson

> desires to purchase and Sellers desire to sell all of Sellers' right, title and interest in and to certain oil, gas and mineral leases and associated assets and contract rights owned by Sellers and located generally in the Hub Field, Marion, [sic] County, Mississippi.

Article 1.01.01 of the proposed PSA provided:

---

[3] Samson's first two offers came in the form of letters clearly labeled "Offer to Purchase" rather than a PSA. See Record Document 89, Ex. 5.

> Sellers covenant and agree to sell to Purchaser, and
> Purchaser covenants and agrees to buy from Sellers all of
> Sellers' right, title and interest in and to the properties
> more specifically described below . . . .

It was signed by Rowland, on behalf of Samson, and had a separate signature block for each seller to sign.[4]

Will-Drill later contacted Samson indicating that eight of the sellers included on the signature pages had decided not to sell their properties at the price offered and identified four new sellers who wanted in on the deal. The parties disagree on the nature of the withdrawal of the eight sellers. Will-Drill maintains that the potential withdrawal of sellers had been discussed prior to the drafting of the PSA. Samson disputes this assertion. Ten days before the February 2002 closing date, Samson provided a letter to Will-Drill declaring that it was withdrawing its offer to purchase. Rowland authored the letter to Nix, stating that the PSA "has not been executed by all of the Selling parties" and that it therefore "constitutes an outstanding but unaccepted offer. Samson hereby withdraws/rejects such offer."

B.  **Procedural History.**

Will-Drill and several of the sellers who signed the PSA brought suit against

---

[4]It also contained a provision which provided for arbitration of any "action, dispute, claim or controversy of any kind now existing or hereafter arising between the parties in any way arising out of, pertaining to or in connection with" the PSA.

Samson in Louisiana state court seeking specific performance of the contract or damages. They then amended their complaint seeking to invoke the arbitration provisions of the PSA. Based on diversity jurisdiction, Samson removed the case to this court and counterclaimed for breach of the Confidentiality Agreement. Samson contended that by filing this lawsuit, Will-Drill breached the Confidentiality Agreement wherein the parties agreed that until all parties executed a "Definitive Agreement" no party would have "any legal obligation of any kind whatsoever" outside of their obligations in the Confidentiality Agreement. After removal, additional plaintiffs were added, all of whom had signed the PSA. The plaintiffs moved to stay the proceedings and compel arbitration pursuant to the Federal Arbitration Act. In the alternative, the plaintiffs also moved for partial summary judgment. Samson also moved for partial summary judgment, contending that the PSA never came into existence and that Will-Drill breached the Confidentiality Agreement, and moved to strike portions of an affidavit of Nix that had been presented to the court.

Magistrate Judge Roy S. Payne reviewed the case. He applied the doctrine of separability, and determined that whether the PSA was an enforceable contract was an issue for the arbitrator, not the court, to decide. The magistrate judge

recommended that the court grant partial summary judgment in favor of Will-Drill by ordering arbitration, deny Samson's motion for partial summary judgment, and deny the motion to strike as moot. This court agreed and adopted the magistrate judge's report and recommendation. Samson appealed the judgment compelling arbitration and the denial of its motion for partial summary judgment. The Fifth Circuit Court of Appeals vacated this court's order staying the proceedings and enforcing arbitration and the grant of partial summary judgment to Will-Drill, and remanded the case for further proceedings, concluding that where the very existence of an agreement to arbitrate is at issue, it is for the courts to decide based upon state law contract formation principles. Thereafter, the parties filed the motions that are now at issue.[5]

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions

---

[5] In a separate memorandum ruling, this court granted a motion for partial summary judgment filed by Will-Drill, seeking dismissal of Samson's counterclaim that Will-Drill had breached the Confidentiality Agreement by filing the instant lawsuit. Samson's counterclaim was dismissed with prejudice. See Record Documents 123 and 124.

7

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 263 (5th Cir. 2002). If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004)(citations and quotations omitted). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005).

**B.     No Contract Was Formed Between The Parties.**

Samson contends that the PSA was an offer to purchase *all* of the sellers' properties, which was rejected when less than all of the sellers signed the PSA.

Thus, Samson asserts that no agreement of any kind was reached between the parties. Samson essentially argues that all of the sellers' signatures were required for the formation of the contract and is attacking the very existence of any agreement. Samson asserts that with less than all of the sellers' signatures, Samson's offer was rejected and a counteroffer was made by Will-Drill, which Samson withdrew and/or rejected.

Will-Drill, however, contends that the PSA satisfies the requisites for an enforceable contract in Louisiana and that the PSA did not require participation by every owner identified therein.[6] Essentially, Will-Drill argues that the reasoning proposed by Samson is just a "clever" attempt to create reasons to justify its last minute withdrawal from the transaction. Will-Drill contends that prior to the execution of the PSA by Samson and at all other pertinent times, Will-Drill and Samson contemplated, discussed and agreed that some of the minor interest holders might elect not to sell their interests.

This court cannot undertake the task of contract interpretation before

---

[6]In the alternative, Will-Drill asserts that the conduct of the parties, both before and after execution of the PSA, belies the position now advocated by Samson, or that a genuine issue of material fact exists as to the common intent of the parties. However, the court need not reach these arguments, as no contract was ever confected between the parties.

9

considering the basic requirements for contract formation. See Ingraffia v. NME Hosps., Inc., 943 F.2d 561 (5th Cir. 1991). Under Louisiana law, four elements are necessary for the confection of a valid contract: (1) capacity to contract; (2) mutual consent; (3) cause or reason for obligating themselves; and (4) a lawful purpose. See La. Civ. Code arts. 1918, 1927, 1966, 1971 and 2029; Higgins v. Spencer, 531 So.2d 768, 770 (La. App. 1st Cir. 1988). Louisiana law explains the third element–the element of mutual consent and the element critical to the issue before this court–as follows:

> A contract is formed by the consent of the parties established through offer and acceptance.

La. Civ. Code art. 1927. The evidence before the court reveals that mutual consent never occurred in this case. The parties failed to confect a valid contract because the transaction lacked the crucial element of mutual consent. See West v. Carbone, 126 So.2d 416, 420 (La. App. 2nd Cir. 1960). This conclusion precludes any claim for breach of contract.

A party claiming the existence of a contract has the burden of proving that the contract was perfected. See Enter. Prop. Grocery, Inc. v. Selma, Inc., 38,747 (La. App. 2. Cir. 9/22/04), 882 So.2d 652 (citing Pennington Constr., Inc. v. R A Eagle Corp., 94-0575 (La. App. 1 Cir. 3/3/95); 652 So.2d 637). In order for a contract

to be formed, an acceptance must be in all things conformable to the offer. An offer must be accepted as made to constitute a contract. A modification in the acceptance of an offer constitutes a new offer which must be accepted in order to become a binding contract. See Rodrigue v. Gebhardt, 416 So.2d 160, 161 (La. App. 4 Cir. 1982). When reviewing written negotiations, the question of whether an offer was accepted and a contract was formed is a question of law for the court to decide.

Will-Drill contends that requiring every seller identified in the PSA to sign the agreement before it became a valid contract would be contrary to the intent of the parties.[7] In support of that argument, Will-Drill refers to section 5.02 of the PSA, entitled "Conditions to Obligations of Purchaser," arguing that the section does not say that less than all signatures would prevent enforcement of the agreement. Therefore, Will-Drill asserts that Samson could have insisted on language to that effect, if that was its intent, but that Samson failed to include basic provisions to require 100% participation by the sellers. Will-Drill thus concludes that Samson's "all of the sellers'" argument is inconsistent with the specific provisions of the agreement as well as the meaning suggested by the PSA as a whole.

---

[7]Will-Drill also attempts to assert that the sellers who did not participate were "nominal" or "non-essential." Under the proposed PSA, all sellers were essential, as each was identified by name and had signature lines, and provisions of the PSA referenced all of sellers' interests.

Will-Drill's argument can just as easily be turned against it. Although Will-Drill is correct that the proposed PSA does not explicitly state that all sellers must sign the agreement for it to be valid, it also does not state, or even imply, that signatures of less than all sellers would result in a perfected contract. In fact, provisions throughout the proposed PSA indicate that acceptance by all of the sellers *was* the intent of the agreement. The second page of the proposed agreement clearly states:

> Purchaser desires to purchase and Sellers desire to sell *all of Sellers' right, title and interest* in and to certain oil, gas and mineral leases and associated assets and contract rights owned by Sellers. . . .

Record Document 89, Ex. 9 at 2 (emphasis added). Section 1.01.01 of the proposed PSA states that "Sellers covenant and agree to sell to Purchaser, and Purchaser covenants and agrees *to buy from Sellers all of Sellers' right, title and interest* in and to the properties more specifically described below. . . ." Id. (emphasis added). Section 1.01.03 refers to the conveyance of "Sellers' interest in the subject properties. . . ." Id. at 4. The word "Sellers," is used repeatedly throughout the proposed PSA and when used to refer to the sale, there is no qualifying term such as "each" or "individual" modifying the collective word "Sellers." Further examples of this include section 6.01, which states that "Sellers shall execute,

acknowledge and deliver to Purchaser the Assignments, completely and validly executed, conveying the Subject Properties as of the Effective Date." Id. at 15. Section 6.03 provides that "Sellers shall, to the extent Sellers can do so, and except as specifically provided in this Agreement, turn over possession of the Subject Properties. . . ." Id. Section 12.11 states: "This Agreement may be executed in any number of counterparts and each counterpart shall be deemed to be an original instrument, but all such counterparts shall constitute but one instrument." Id. at 29. All of the foregoing provisions indicate that the agreement contemplated that each seller would be required to sign and participate before a valid contract could be confected.

Louisiana Civil Code article 1943 is pivotal because it provides that an acceptance of an offer that is not in accordance with the terms of the offer is deemed to be a counteroffer. Since all of the sellers did not sign the PSA at the time they attempted to accept the offer, Will-Drill purported to change the offer by deleting certain sellers and adding other sellers. These actions constituted a counteroffer because it was an acceptance not in accordance with the original offer to buy *all* of the sellers' properties. An enforceable agreement never occurred between the

13

parties.[8]

In another futile attempt to convince the court that a contract exists between the parties, Will-Drill grasps at the name of the document, "Proposed Sale Agreement." However, it is beyond peradventure that the title given to the proposed PSA does not serve to make it a binding agreement. Louisiana courts routinely construe delivery of similarly titled documents as an offer, and the mere title of the document does not change its status or indicate that a valid offer and acceptance took place between the parties. See LaSalle v. Cannata Corp., 03-0954 (La. App. 1 Cir. 4/2/04), 878 So.2d 622; Baldwin v. Bass, 28,984 (La. App. 2 Cir. 12/11/96), 685 So.2d 436, 439. Samson's offer never became a contract because the sellers never accepted Samson's offer in accordance with its terms.

Will-Drill also refers the court to provisions of the PSA that address termination and title defects in support of its argument that a valid contract existed between the parties. However, only if a valid contract **existed** did the question of termination or title defects arise. As the court has repeatedly confirmed, in order to be effective, the acceptance must comply with all terms in the offer. Will-Drill

---

[8]Will-Drill also attempts to persuade the court to consider alleged custom in the industry as to formation of agreements such as the one at issue. While custom and usage may modify, restrict or enlarge a contract, such custom and usage may not create a contract or give rise to a new obligation.

14

argues that the PSA contemplates and allows for adjustments to the base purchase price based on actual interests delivered. See Record Document 89, Ex. 9 at Section 1.05. However, this provision can be just as easily interpreted to apply to adjustments that could occur regarding the "sellers'" properties. None of the price adjustment provisions apply to the case of a seller who chooses not to sell. Nor are the termination provisions relevant, as no executed agreement ever came into existence.

Nix, on behalf of Will-Drill, sent a letter to Samson, notifying it that eight sellers had elected not to sell. Samson responded by withdrawing its offer and rejecting the counteroffer by Will-Drill. Thus, the following legal consequences resulted: (1) the sellers rejected Samson's offer; (2) Will-Drill proposed a counteroffer that Samson rejected; and (3) Samson revoked its offer before the sellers accepted it. The January 22, 2002, letter from Nix proposed a counteroffer by offering a different agreement. There were different sellers, different interests, and a different price. "Acceptance not in accordance with the terms of the offer is deemed to be a counteroffer." La. Civ. Code art. 1943. LaSalle v. Cannata Corp., 03-0954 (La. App. 1 Cir. 4/2/04), 878 So.2d 622; Rodrigue v. Gebhardt, 416 So.2d 160, 161 (La. App. 4 Cir. 1982); Ingraffia v. NME Hosps., Inc., 943 F.2d 561,

566 (5th Cir. 1991). The court cannot, and will not, construct for the parties a contract that they did not make.

This case is about elementary principles of contract formation–a valid offer and acceptance according to Louisiana Civil Code articles 1927 and 1943. A modification in the acceptance of an offer constitutes a new offer which must be accepted in order to become a binding contract. See La. Civ. Code art. 1943; LaSalle v. Cannata Corp., 03-0954 (La. App. 1 Cir. 4/2/04), 878 So.2d 622; Tombrello v. Board of Com'rs. of the Caddo Levee Dist., 129 So.2d 595 (La. App. 2d Cir. 1961); Marine Chart. (Gulf) Ltd. v. Boland Mach. & Mfg. Co., Inc., 273 So.2d 316 (La. App. 4th Cir. 1973). Will-Drill's attempted acceptance was a new offer because it contained a modification of the terms of the offer. Thus, Samson had to accept Will-Drill's new offer for a binding contract to exist. This acceptance never occurred; therefore, there was no agreement. Will-Drill's alteration of the PSA, as a matter of law, was "[a]n acceptance not in accordance with the terms of the offer [and thus] is deemed to be a counteroffer." La. Civ. Code art. 1943. It follows that no contract was ever entered into between the parties. By definition, a breach of contract claim requires a contract. Because this court finds that no

contract existed between the parties, "none could be breached."[9] Delta Testing and Inspection, Inc. v. Ernest N. Morial New Orleans Exhibition Hall Auth., 96-2340 (La. App. 4 Cir. 8/20/97), 699 So.2d 122, 125.[10]

### III. CONCLUSION

Based on the foregoing analysis, Will-Drill's motion to re-urge its prior

---

[9] Much of Will-Drill's argument is devoted to the question of whether Samson was acting in good faith with regard to the withdrawal from the proposed PSA. Having found the proposed PSA was not a valid contract, however, the court concludes that the good faith of Samson was irrelevant; there is no contract or legally binding obligation on which to impose a duty to act in good faith.

[10] Even if the court were to reach the contract interpretation issue, Will-Drill would nevertheless be unable to succeed in its breach of contract claim. Will-Drill contends that the PSA is clear and explicit, that it does not lead to absurd consequences and that it resulted in an executed contract. Samson, however, directs the court to the Confidentiality Agreement, executed only by Will-Drill, who was defined as "Will-Drill Resources, Inc., and its affiliates, partners, venturers and others having any interest in the Properties," and Samson, three months prior to the drafting and formation of the PSA. The Confidentiality Agreement clearly provides that each mineral owner would only be bound to sell his respective interest upon execution of a definitive agreement. Definitive agreement is defined as "the final definitive business agreement containing the terms and conditions of the Transaction which has been fully executed by all parties thereto." Will-Drill set standards in the Confidentiality Agreement and a binding contract could not be formed based on an informal understanding, e-mails, standard, custom or practice. Under Will-Drill's own terms, Samson's offer never became binding. Will-Drill argues that the Confidentiality Agreement was never intended to alter the PSA or to control the terms of a "definitive agreement" but was to facilitate and govern the review of information. However, regardless of whether the Confidentiality Agreement applies, no agreement, definitive or not, ever came into being. Eight sellers refused to execute and thus the offer was never accepted nor was it "fully executed."

motion for summary judgment (Record Document 85) is **DENIED**. Samson's motion for summary judgment (Record Document 89) is **GRANTED** to the extent that it seeks dismissal of the plaintiffs' claims against it.[11] The motion is **DENIED** in all other respects.

A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.[12]

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this 30th day of September, 2005.[13]

JUDGE TOM STAGG

---

[11]This court has previously issued a memorandum ruling wherein Will-Drill's motion for summary judgment as to Samson's counterclaim was **GRANTED** and Samson's counterclaim for fees was dismissed. See Record Documents 123 and 124.

[12]Also pending before the court are two motions in limine, one filed by the plaintiffs and one filed by the defendant. See Record Documents 114 and 119. As the court has determined that no contract exists and judgment is granted in favor of Samson, the motions in limine are **MOOT**.

[13]Samson has filed two motions to strike (Record Documents 99 and 106) statements contained within Nix's affidavit and the attachments to his affidavit. This court is aware of Rule 56's admonition that only admissible evidence may be considered in ruling on a summary judgment motion. See Stults v. Conoco, Inc., 76 F.3d 651, 654-55 (5th Cir. 1996). The court--fully cognizant of the evidentiary standards--will consider Nix's affidavit and his supporting documents, giving the statements due weight and appropriately discounting any improper statements and evidence. Samson's motions to strike are **DENIED**.